IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ARTHUR ELDER | * | |
| | * | |
| v. | * | Civil No. JFM-06-0023 |
| | * | |
| TOWN OF EMMITSBURG, et al. | * | |
| | * | |
| | * | |
| | ***** | |

MEMORANDUM

This action arises from a published report of the Ethics Commission of the town of Emmitsburg, Maryland that found plaintiff Arthur Elder, a member of the town's Board of Commissioners, had inappropriately used his position of authority to benefit the business interests of himself and a family member.  In seeking judicial review of the Ethics Commission's decision as well as compensation for the damage the report inflicted upon his reputation and political career, Elder brought suit in the Circuit Court for Frederick County against the Ethics Commission and its Chair, Patrick Brennan, the Board of Commissioners, and Mayor James Hoover.  Because certain of the counts in the complaint allege deprivations of Elder's federal constitutional right to due process in violation of 42 U.S.C. § 1983, the defendants removed the action to this court.  Now pending is the defendants' motion to dismiss or, in the alternative, for summary judgment. For the reasons that follow, the motion will be granted in part and the case remanded back to the Circuit Court for Frederick County.

1

I.

A.

The ancestors of Arthur Elder were some of the original settlers of Emmitsburg, Maryland, a town in which Elder himself has lived all his life. (*See* Elder Affidavit at ¶ 3, Exhibit 1 to Elder Opp. Br.) He ran a printing business named Chronicle Press Inc. until 2002 or 2003, at which point he sold it and the building in which he operated it to David Runkle, who renamed the business Custom Image Printing. (*See id*; Elder Opp. at 3; Ethics Commission Report at 3, Exhibit B to Compl.) Since 1975 Elder has also owned the Emmitsburg Car Wash. (Elder Affidavit at ¶ 2.) It was from these two business interests that the ethics imbroglio sprang.

During the severe drought of 2002, Elder was required to operate his car wash, then the only one in town, on a restricted schedule. (*Id*. at ¶ 3.) At the same time, however, a man by the name of Kirby Delauter proposed opening another car wash within the town limits. (*Id*.) Elder attempted to block this effort by telling the town's leaders that the combination of water restrictions and Delauter's competition could bankrupt his own business. (*Id*.) Despite this protest, Delauter was permitted to proceed with his plan. Soon thereafter he, along with Carl Athey, opened Silo Hill Car Wash. (*Id*.)

Presumably spurred on by this experience, Elder decided to run for a seat on the town's Board of Commissioners ("Board"). (*See id*. at ¶ 4.) Campaigning on a platform committed to limiting growth and development, Elder defeated incumbent Patrick Brennan in a closely contested election held in April 2003. (Elder Affidavit at ¶ 4; *see* Elder Press Release at ¶ 3, Exhibit 6 to Elder Opp. Br.) Later that year Mayor James Hoover nominated Brennan to serve as

Chair of the town's three-member Ethics Commission ("Commission").  (Brennan Affidavit at ¶ 1, Exhibit 1 to Def. Br.)  As required by town ordinance, the nomination was submitted to the Board for their approval, which they, including Elder, gave unanimously on September 8, 2003.  (*Id*.)

Also in September 2003, Runkle filed for bankruptcy on behalf Custom Image Printing.  Within months Elder foreclosed on the business's office building and equipment due to Runkle's failure to make his mortgage payments.  Elder then turned around and sold the business to his cousin Lisa Elder in May 2004.  (*See* Elder Affidavit ¶ 7; Chris Patterson, *Court Inspects Ethics Accuser*, GAZETTE.NET, Jan. 27, 2005, at ,1 Exhibit 3 to Elder Opp. Br.; Commission Report at 3.)  Resurrecting the name Chronicle Press, Ms. Elder obtained the necessary permits to begin running the business herself on July 14, 2004.  (Commission Report at 3.)  One week later, Runkle applied for a permit to reopen and operate Custom Image Printing from his Emmitsburg home.  (*Id*.)  He obtained the permit on September 13, 2004.  (*Id*. at 4.)

B.

The Commission received a complaint from Runkle on October 6, 2004 alleging that Elder and William B. O'Neil, Jr., President of the Board, had violated the town's ethical code of conduct for its officials.  (Brennan Affidavit at ¶ 2.)  Specifically, Runkle alleged that Elder and O'Neil had used their positions of authority to try and undermine his printing business in order to benefit Lisa Elder and Chronicle Press.  (Runkle Complaint, Exhibit A to Def. Br.)  Noting that Runkle had urged him to do so, Delauter filed a similar complaint on November 24, 2004 with respect to his and Elder's car washes, though he did not mention O'Neil in his allegations.  (Brennan Affidavit at ¶ 3; Delauter Complaint, Exhibit B to Def. Br.)  Delauter, along with his

partner Athey, appeared before the Commission on December 14, 2004 to describe in more detail the facts underlying his complaint.  (Brennan Affidavit ¶ 4; Minutes of Commission Meeting (December 14, 2004), Exhibit C to Def. Br.)  Within a week the Commission decided to launch a formal investigation, a fact Brennan divulged to a local newspaper.  (Compl. ¶ 26.)

The Commission wrote to Elder on December 23, 2004 to notify him of its inquiry and to request that he appear before it, accompanied by counsel if he so chose.  (First Commission Letter to Elder (December 23, 2004), Exhibit E to Def. Br.)  Included with the letter were copies of the two complaints.  (*Id*.)  Elder did not comply with the request, but rather issued a press release on January 10, 2005 refuting the allegations and claiming that the investigation was a "political witch hunt by individuals who have personal and political grudges against Bill O'Neil and me."  (Elder Press Release at 1-2, Exhibit 6 to Elder Opp. Br.)  He further stated that he would not appear before the "kangaroo court" because it was led by his political foe Brennan, and because there were no procedures in place to protect his right to due process.  (*Id*; Elder Opp. Br. at 4.)  Despite this unequivocal denunciation of the investigation, the Commission asked him twice more to comply with its request.  (Second Commission Letter to Elder (February 7, 2005), Exhibit F to Def. Br.; Third Commission Letter to Elder (February 24, 2005), Exhibit G to Def. Br.)  The last letter informed Elder that his refusal to meet with the Commission would not prevent it from continuing its investigation.  (*See* Third Commission Letter to Elder.)

And continue the Commission did, even in the face of a public demand by at least one Emmitsburg citizen that Brennan either recuse himself or halt the investigation.  (Compl. ¶ 34.) In addition to Delauter and Athey, the Commission interviewed the following persons under

4

oath: Michael Lucas, Director of Town Planning; Jennifer Joy, Planning Technician for the town; Deputy James Moxley of the Frederick County Sheriff's Department; David Haller, Town Manager; Mayor Hoover; and Eva Miller, a former code enforcer for the town.  (Commission Report at 1-2.)  Neither Elder nor O'Neill ever appeared before the Commission.

C.

The investigation wrapped up in April 2005. Its final product was an eight-page report.  With respect to Runkle's complaint, the Commission made three factual findings.  First, Elder had approached Lucas, the Town Planner, on May 4, 2004 and asked if there was any way for Lisa Elder to avoid the required building inspection of her new offices.  (Committee Report at 3.)  Second, in July and August of 2004, O'Neil had persistently asked Lucas, one time in the presence of Elder, to use unannounced inspections to determine whether Custom Image Printing had been doing business before the company had secured its home operation permit.  (*Id*. at 3-4.)  Finally, O'Neil and Elder had attended a meeting of an anti-growth organization they both belonged to on May 20, 2004, at which it was decided that the organization would hire Chronicle Press to make fliers.  Both men knew at that time, however, that the company had not obtained the necessary permits to begin operations.  Though the Commission did not determine that either were behind the proposal or had a say in its approval, it claimed that they "allowed" the proposal to pass, implying that their silence was contrary to their supposed concern about unlicensed business operations and thus betrayed their favoritism toward Chronicle Press.  (*Id*. at 4.)

Based on these findings the Commission concluded that O'Neil, and O'Neil only, had committed an ethical violation, specifically the use of his prestige of office in an attempt to benefit Chronicle Press at the expense of Custom Image Printing.  (*Id*. at 4-5.)  However, the first

5

factual finding did include the following sentence: "The Commission has determined that Commissioners Elder and O'Neil used their positions on the [Board] to provide Chronicle Press special treatment." (*Id.* at 3.)  And the remedial action the Commission recommended, as discussed below, also focused on Elder's involvement with the two printing businesses. (*Id.* at 7.)

As for Delauter's complaint, the Commission made two findings of fact. First, on August 30, 2004, the secretary of the anti-growth organization to which Elder and O'Neil belonged asked Mayor Hoover to limit the hours Delauter could keep Silo Hill Car Wash open, force him to remove a sign in front of the car wash, and require him to hire a full-time attendant. (*Id.* at 5.) O'Neil later put forth a proposed ordinance at a Board meeting on December 7, 2004 to effectuate these demands, though he withdrew it when someone complained about the inequity of not requiring the same of Elder's Emmitsburg Car Wash. (*Id.*)  Second, a witness (the report does not say who) testified that he heard Elder say that Delauter would regret filing the ethics complaint because the Board "can make things rough on him." (*Id.*)

The Commission concluded from these findings that Elder had committed two ethical violations.  He had used the prestige of his office in an attempt to undermine his competitor's business, and he participated in activities that had a financial impact on him. (*Id.* at 6.)

Also included in the report was an additional finding of fact unrelated to the two complaints. Both Lucas and Jennifer Joy, the town's Planning Technician, testified that in July 2004 they had gone to a person's home to tell them to take down scaffolding that was obstructing the public's right of way. (Committee Report at 6.)  O'Neil and Elder arrived on the scene shortly thereafter, and O'Neil told the town officials to leave the person alone. (*Id.*)  When

6

Lucas said that they had acted at Mayor Hoover's request, O'Neil pointed to himself and Elder and stated "The Mayor has no authority to tell you what to do[.]  [Y]ou are looking at the power!"  (*Id*.)

Taking all of these incidents into account, the Commission stated its belief that a "pattern of abuse emerges."  (*Id*. at 7.)  Although Elder had "been relatively quiet in terms of public statements," the Commission emphasized that "he [had] been witness to actions . . . which have resulted in special treatment to his own interests . . . ."  (*Id*.)  Thus, it recommended that the Board issue a cease and desist order prohibiting Elder from further involvement with issues pertaining to the printing and car wash businesses, including voting on matters that would impact them.  (*Id*.)  The Commission made the same recommendation for O'Neil.  (*Id*. at 7-8.)

Mayor Hoover called a special meeting of the Board on April 18, 2005 for the purpose of releasing publicly the Commission's report and for voting on how to address the ethical violations committed by Elder and O'Neil.  (Compl. ¶ 35.)  At the meeting, at which local media were present, Mayor Hoover proposed asking state prosecutors to bring charges against Elder and O'Neil for their violation of the code of conduct, which is a misdemeanor offense.  (*Id*. ¶¶ 35, 37.)  The Board declined, and instead decided to follow the Commission's recommendation and issue a cease and desist order.  (*Id*. ¶ 35.)

The mayoral election was held eight days later on April 26, and Mayor Hoover's only opponent was Elder.  (*Id*. ¶ 33.)  Elder lost.

D.

Elder filed suit against the Commission, the Board, Brennan, and Mayor Hoover (collectively the "defendants") in the Circuit Court for Frederick County on November 23, 2005.

Invoking this court's federal question jurisdiction, the defendants removed the action on January 4, 2006.

In the first paragraph of the complaint Elder sums up the relief he is seeking by stating the following:

> [T]his is an action for a declaratory judgment pursuant to [Md. Code Ann., Cts. & Jud. Pro. § 3-409] for the purpose of determining a question of actual controversy between the parties and terminating uncertainty and controversy giving rise to this proceeding, *and in the alternative*, an action for personal injuries suffered pursuant to Defendants' breach of duty.

(Compl. ¶ 1 (emphasis added).)  Elder's "action for personal injuries" takes the form of four counts included at the end of the complaint, the substance of which are discussed below.  The relief he is seeking to obtain through a declaratory judgment is not immediately clear, in light of the fact that he does not mention the claim again in the rest of his complaint, nor do the parties address it in their memoranda.  It appears that Elder is not requesting a declaration that the defendants violated the rights articulated in the four "personal injury" counts because the first paragraph of the complaint is written in the disjunctive (as highlighted by the emphasis added above), and the prayers for relief in each count request only monetary damages.  (*Id.* ¶¶ 23, 30, 37, 42.)  Thus, it may be that Elder is seeking judicial review of the decision rendered by the Commission. *See e.g.*, *Carroll County Ethics Comm'n v. Lennon*, 703 A.2d 1338, 1340 (Md. Ct. Spec. App. 1998) ("Appellee then filed a complaint for injunctive and declaratory relief in the Circuit Court for Carroll County, claiming, among other things, that appellant erred as a matter of law in its interpretation of the Ethics Ordinance.").

As for the "personal injury" counts, the first three are brought under 42 U.S.C. § 1983 and allege deprivations of Elder's constitutional right to due process.  In the first count, which is

8

brought against all the defendants, he alleges that the town's code of ethical conduct suffers from two deficiencies: it is unconstitutionally vague, and does not set forth procedural guidelines for the Commissioners to adhere to during an investigation.  (Compl. ¶¶ 15-23.)  In the second count, Elder asserts a claim against Brennan in his individual capacity for the following alleged wrongs: failing to recuse himself from the investigation; informing the local newspaper about the existence of the investigation without first obtaining Elder's consent; conducting the investigation without adequate procedural guidelines; and failing to interview witnesses favorable to Elder.  (*Id*. ¶¶ 24-30.)  Finally, in the third count Elder sues Mayor Hoover in his individual capacity for appointing Brennan to the Commission; allowing the investigation to continue without any legally fixed procedural guidelines; holding the special Board meeting, at which the Commission's report was released, one week before the mayoral election; and failing to reimburse Elder for his attorney fees as required by Md. Code Ann., Cts. & Jud. Proc. § 5-507.  (Compl. ¶¶ 31-37.)

       The fourth and final count of Elder's complaint is brought against all the defendants.  Captioned "Non-Constitutional Torts: Negligence, Defamation, Negligent Infliction of Emotional Distress, and Humiliation," the count alleges that the defendants breached their duty to protect Elder's constitutional rights, which resulted in the publication of the Commission's report virtually on the eve of the mayoral election.  That report, Elder claims, unfairly influenced voters and inflicted upon him emotional distress and humiliation.  (*Id*. ¶¶ 38-42.)

       In their pending motion the defendants seek dismissal of the defamation, negligent infliction of emotion distress, and humiliation claims, and summary judgment on the negligence and due process claims.  They do not, however, mention Elder's request for a declaratory

judgment. I will grant the motion as to the due process claims and remand the case to the Circuit Court for Frederick County for further proceedings as to the state law claims. Before discussing the reasons for my rulings, it is first necessary for me to discuss the history and content of Emmitsburg's code of ethical conduct.

## II.

In 1979 the Maryland General Assembly enacted a comprehensive Public Ethics Law. Md. Code Ann., State Gov't § 15-101 *et seq*. The law prohibited State officials from engaging in conduct that presents a conflict of interest (subtitle 5), required that they make annual disclosures of certain gifts, outside employment, and financial and property interests (subtitle 6), required lobbyists to register with the State and file certain reports (subtitle 7), created a State Ethics Commission to administer the law (subtitles 2, 3, and 4), and provided certain enforcement procedures (subtitle 9). *State Ethics Comm'n v. Evans*, 382 Md. 370, 373-74 (Md. 2004). Additionally, the law required counties and municipal corporations to adopt comparable ordinances for their officials and employees relating to conflicts of interest, financial disclosure, and lobbying (subtitle 8). *Id*.

Accordingly, the Emmitsburg Board enacted by ordinance its own Code of Ethics ("Code") in February 1982. Emmitsburg Code of Ethics § 2.32 *et seq.*, *available at* http://www.emmitsburg.net/towngov/regulations/code_index.htm. Bound by the Code were "the president, mayor, treasurer, members of the board of commissioners, employees of the town, members of the planning and zoning commission, and members of the planning and zoning board of appeal." For enforcement purposes the Commission was given the responsibility to, *inter alia*, "process and make determinations as to complaints filed by any person alleging

violations of this chapter," *id*. § 2.32.020(C), and the power to "issue a cease and desist order [enforceable in the Circuit Court for Frederick County] against any person found to be in violation of this chapter," *id*. § 2.32.080(A).  Additionally, the Code provides that a violation is a misdemeanor punishable by a fine not to exceed $500 and/or imprisonment not to exceed ninety days, *id*. § 2.32.080(C), and that the violator "may be subject to disciplinary or other appropriate personnel action, including suspension of salary or other compensation," *id*. § 2.32.080(B).

The specific conflict of interest provisions in the Code that the Commission found Elder to have violated are as follows:

> Persons holding positions described in 2.32.010 shall not:
> A. Participate on behalf of the town in any matter which would to their knowledge have a direct financial impact on them, their spouse or dependent child or any business entity with which they are affiliated;
> …
> J. Use the prestige of their office or position for their own benefit or that of another

*Id*. § 2.32.020.  Also relevant to Elder's claims are three provisions omitted from the Code but included in the Public Ethics Law.  First, the Code does not set out a procedural framework by which the Commission is to consider complaints and render decisions.  Md. Code Ann., State Gov't § 15-404(a)(1) ("A hearing on a complaint shall be conducted under Title 10, Subtitle 2 (Administrative Procedure Act—Contested Cases) of this article to the extent that subtitle is consistent with this title.").  Second, the Code does not require that complaints be signed and made under oath.  Md. Code Ann., State Gov't § 15-401(a)(2).  Third, the Commission is not prohibited from discussing publicly the contents of a complaint or the existence of the investigation.  *Id*. § 15-407(a)(1) ("[T]he proceedings, meetings, and activities of the Ethics Commission and its employees relating to the complaint are confidential."); *id*. § 15-407(a)(2) ("[I]nformation relating to the complaint, including the identity of the complainant and

11

respondent, may not be disclosed by[, *inter alia*,] the Ethics Commission."); *id*. § 15-407(c)(1) ("The Ethics Commission may release any information at any time if the respondent agrees in writing to the release."). However, the Public Ethics Law does not require that such provisions be included in local codes, though the State Ethics Commission did promulgate a regulation in 1981 stating that local codes "should establish some mechanism for processing and making determinations in response to formal complaints . . . ." Md. Code Regs. 19A.04.02.03.

III.

Turning first to Elder's due process claims, I find that he has not pled facts that would entitle him to relief. Elder alleges that every stage of the investigation was infected by personal vendetta and suffered from constitutional infirmity, including Brennan's failure to recuse himself from the investigation and his public disclosure of the contents of the complaints; the lack of procedural guidelines within the Code mirroring those contained in the State's Public Ethics Law; to Hoover's decision to call a Board meeting to discuss the Commission's report one week before the mayoral election. However, Elder ignores the fundamental principle that "[t]he Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 125 S. Ct. 2384, 2393 (2005). Putting aside for the moment Elder's assertion that he is owed attorneys fees under Md. Code Ann., Cts. & Jud. Proc. § 5-507, the defendants' actions with respect to the investigation and the release of the Commission's report did not deprive Elder of his life or property. What they did deprive him of was his ability to engage in certain conduct and his good reputation. Neither of these, however, is a constitutionally protected liberty interest.

The Commission recommended, and the Board approved, a cease and desist order instructing Elder not to use his political authority to influence the business interests of Custom Image Printers and Silo Hill Car Wash. Because such conduct would be a clear violation of the Code, the order did not prohibit Elder from engaging in any course of behavior in which he had a lawful right to engage before the investigation began.[1] Elder does not contend otherwise, arguing instead that he did nothing improper to necessitate the issuance of the recommendation and the order in the first place. (*See e.g.*, Elder Opp. Br. at 9 ("The final Report of the Ethics Committee held Mr. Elder in violation of the Ethics Code of Emmitsburg. No specific examples supported the Commission's findings . . . ."); *id*. at 13 ("It can be inferred that Mayor Hoover specially appointed Mr. Brennan because he wanted to find Mr. Elder in violation of the Ethics Code, and knew Mr. Brennan would do it.").) Assuming *arguendo* that this contention is true, the sole consequence of the defendants' actions was a false, public accusation of ethical misconduct. Yet while the Supreme Court has acknowledged "the frequently drastic effect of the 'stigma' which may result from defamation by the government," it has refused to accept "the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976); *see also Connecticut Dep't of Public*

---

[1] On the surface, it might appear that Elder's vagueness claim contradicts this statement. However, upon reading his allegations closely, it becomes clear that Elder does not contend that the Code itself is vague. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (requiring "that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement") (citations omitted). Instead, he quarrels with the Commission's application of the Code to its factual findings, stating that the only way those findings could support the Commission's conclusion that he acted unethically is if the Commission interpreted the Code unreasonably. (*See* Elder Opp. Br. at 18-21.) If such an unreasonable interpretation is considered valid, he argues, the Code must be vague. (*Id*.)

*Safety v. Doe*, 538 U.S. 1, 6-7 (2003). Thus, plaintiffs alleging damage to reputation caused by the government must seek relief under state tort law, *Paul*, 424 U.S. at 697-99, as Elder does in count four of his complaint.

Returning to the issue of attorneys fees, Maryland law grants immunity from civil suit to local government officials for non-malicious discretionary acts conducted within the scope of their employment. Md. Code Ann., Cts. & Jud. Proc. § 5-507(b)(1). To further protect these officials, towns are required to provide a defense for them whenever they are sued for "any act arising within the scope of [their] employment or authority." *Id*. § 507(b)(3)(i). Elder claims that the launch of the Commission's investigation therefore entitled him to a defense provided for by the town, making the defense fees a property right protected by the Due Process Clause. *Town of Castle Rock v. Gonzales*, 125 S. Ct. 2796, 2803 (2005) ("'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'") (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). The fundamental problem with this argument is that it improperly equates the Commission's investigation with a civil suit. Because the two are not the same, Elder did not have a right to a town-funded defense, and thus did not possess a property interest of which he could be deprived.

In sum, having failed to plead facts establishing that he had any constitutionally protected interests, Elder cannot state a valid Section 1983 claim for denial of procedural due process.

IV.

Because there are no federal causes of action remaining, I am exercising my discretion to remand this case to the Circuit Court for Frederick County. 28 U.S.C. § 1367(c)(3). As

discussed in Section I.D, the defendants did not address in their motion or memoranda Elder's request for a declaratory judgment under Md. Code Ann., Cts. & Jud. Pro. § 3-409. If, as *Lennon* suggests, judicial review of the Commission's investigation and report is appropriate, 703 A.2d at 1340, principles of comity dictate that such review would be more appropriately conducted in the Maryland courts. Accordingly, I will not rule upon the defendants' motion to dismiss the defamation, negligent infliction of emotional distress, and humiliation claims, or their motion for summary judgment on the negligence claim, but instead leave those claims to be addressed by the Circuit Court as well.[2]

A separate order is being entered herewith.

---

[2] Though I am not ruling upon these claims, because the issues have been extensively briefed in this court, and in order to assist in expediting the proceedings after remand, I will note what seem to be certain deficiencies in the claims. First, Maryland does not recognize an independent tort of negligent infliction of emotional distress. *Lapides v. Trabbic*, 758 A.2d 1114, 1121 (Md. Ct. Spec. App. 2000). Second, Elder is unable to point to a single Maryland case recognizing the existence of an independent tort of humiliation. Third, assuming *arguendo* that a plaintiff could succeed on a common law negligence claim based on an underlying federal constitutional violation, the defendants did not violate Elder's constitutional right to due process. *Supra* Section III. Finally, there are apparent problems in Elder's defamation claim as well. There are four elements to such a claim:

> (1) that the defendant made a defamatory communication—i.e., that he communicated a statement tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to a third person who reasonably recognized the statement as being defamatory; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm.

*Shapiro v. Massengill*, 661 A.2d 202, 216-17 (Md. Ct. Spec. App. 1995) (citations omitted). Thus, it would appear that the first element requires dismissal of the claims against the Board and Mayor Hoover, neither of which was responsible for the content of the Commission's report. As for Elder's claims against the Commission and Brennan, they appear to fail under the third element. Elder is a public official for First Amendment purposes, requiring that he establish by clear and convincing evidence that the Commission and Brennan acted with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). To be sure, the complaint alludes to Brennan's animosity towards Elder and desire to see him scorned publicly, an allusion Elder's opposition memorandum makes explicit. (*See e.g.*, Compl. ¶¶ 6, 25, 29; Elder Opp. Br. at 25 ("[T]he statements in the Report . . . were made out of ill will, hatred, and a desire to hurt Mr. Elder, and for Mr. Brennan's own personal motives.").) In the context of a defamation suit, however, "actual malice" does not mean animosity, but rather that the defendant acted with "knowledge that [the publication] was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280; *see also Capital-Gazette Newspapers, Inc. v. Stack*, 293 Md. 528, 539-40 (Md. 1982). Nowhere in the complaint does Elder assert that either defendant knew that the report was false or recklessly disregarded its falsity.

Date: April 21, 2006 /s/

J. Frederick Motz

United States District Judge